WHITE MOTOR CORPORATION, a
corporation, Plaintiff,

v.

NORTHLAND INSURANCE COMPANY,
a corporation, Defendant,

Lyle B. Tennant, Interpleaded Defendant.

Civ. 69–163S.

United States District Court,
D. South Dakota, S. D.

July 17, 1970.

Gale E. Fisher, of May, Boe & Johnson, Sioux Falls, S. D., for plaintiff.

John B. Shultz, of Woods, Fuller, Shultz & Smith, Sioux Falls, S. D., for defendant.

Richard B. Braithwaite, of Braithwaite, Cadwell & Braithwaite, Sioux Falls, S. D., for interpleaded defendant.

NICHOL, Chief Judge.

Plaintiff White Motor Corporation has instituted this action to recover for expenses incurred in the repair of a truck insured under a policy written by the defendant Northland Insurance Company which contained a loss payable clause in favor of the plaintiff. White Motor Credit Corporation has been joined as a party plaintiff and the real party in interest by order of the Court dated January 13, 1970. The truck was owned at the time of the collision by Lyle B. Tennant, who has been impleaded by the defendant Northland Insurance Company. Tennant has counterclaimed against Northland for damages to the truck and trailer alleging coverage under the insurance contract.

Both White Motor Corporations are Delaware corporations; the defendant Northland Insurance is a Minnesota corporation. Each corporation has its principal place of business in a state other than South Dakota. The defendant Lyle B. Tennant is a citizen of South Dakota. Jurisdiction is based on diversity of citizenship, the requisite amount having been alleged. 28 U.S.C. § 1332.

FINDINGS OF FACT

On April 16, 1968, plaintiff White Motor Corporation sold through its office in Sioux Falls, South Dakota, a new White Freightliner truck to Lyle B. Tennant and his son Maurice L. Tennant. At the time of the sale and after executing the security agreement Roger Hilmo, a representative of White Motor, and the defendant Lyle S. Tennant telephoned Joe H. Ingalls of Sioux Falls, an agent of defendant Northland Insurance, to request insurance coverage, including collision protection on the truck. Ingalls indicated that he would procure the insurance and send a certificate of insurance to White Motor.

Prior to this time Ingalls had procured insurance on other trucks owned by Lyle Tennant and used in Tennant's trucking business. A policy was issued to Tennant by Northland for the period May 18, 1967, to May 18, 1968. On June 1, 1967, Northland requested that Lyle Tennant sign an endorsement excluding Maurice Tennant from coverage under the policies. Ingalls personally obtained Lyle Tennant's signature on the endorsement and explained the effect of the exclusion to Lyle and Mrs. Tennant. When Hilmo and Lyle Tennant called Ingalls in regard to insur-

ance on the new truck, neither Ingalls nor Tennant mentioned that Maurice Tennant was an excluded driver. Ingalls testified that during the term of the policy, he visited the Tennants on several occasions and was aware that Maurice Tennant was driving trucks belonging to Lyle Tennant in disregard of the exclusion. Ingalls cautioned Lyle and Maurice Tennant that if a collision occurred while the truck was being operated by Maurice Tennant, there would be no coverage under the policy.

When a renewal policy was issued to Lyle Tennant shortly after the purchase of the truck and upon expiration of the existing coverage, Northland requested that Maurice Tennant and another driver, John Jager, be excluded from coverage under the policy. On this occasion, Ingalls stopped at the Tennant home to have Tennant sign the exclusion, but he was not at home. Mrs. Lyle Tennant, who acted as a bookkeeper in her husband's trucking business and who was authorized to sign checks and letters for the business, signed Lyle Tennant's name to the exclusion endorsement. In addition, she signed a credit payment agreement to provide for monthly payments of the insurance premiums. She later told her husband that Ingalls had delivered some insurance papers but may not have mentioned that she had signed the exclusion in his name. Tennant made no inquiry as to the nature of the coverage and testified that he did not read the policy or the exclusion. Tennant continued to make payments of the insurance premiums on a monthly basis until after the collision involved in this lawsuit.

The certificate of insurance mailed to and received by White Motor did not indicate that Maurice Tennant or any other driver was excluded from coverage, but simply stated "This is to certify, that policies in the name of: Lyle B. Tennant of Gettysburg, South Dakota, are in force as follows: Policy number CT 1717, policy period 5–18–68 to 5–18–69; fire, theft, etc., $23,500; collision $250 deductible; and cover in accordance with the policy terms. In the event of any material change in or cancellation of said policies the company will notify the party to whom this certificate is issued of such change or cancellation."

A loss payable clause was also mailed to White Motor by Northland. The clause provided that any loss or damage under the policy with respect to the tractor involved herein would be payable to White Motor as its interests would appear. The clause further provided that the insurance as to the mortgagee "shall not be invalidated by any act or neglect of the Lessee, Mortgagor, Owner * * *." Under another provision, Northland reserved the right to cancel the policy at any time as provided by the terms of the policy, but the cancellation would not be effective as against the mortgagee until ten days after notification of cancellation. A subrogation clause provided that Northland would be subrogated to the rights of the mortgagee if it paid a loss to the mortgagee when it would not be liable to the mortgagor.

White Motor did not request, nor did it receive, a copy of the insurance policy or a copy of the exclusion endorsement.

All parties agree that the White tractor covered by the policy in question was damaged in a collision on February 3, 1969, while being operated by Maurice Tennant. A proof of loss was duly filed by Lyle Tennant in accordance with the terms of the policy.

## CONCLUSIONS OF LAW

### LIABILITY

As this is a diversity case, South Dakota law governs the substantive questions involved. The loss payable clause in favor of White Motor provides that the insurance as to the interest of the mortgagee (White Motor) shall not be invalidated by any act or neglect of the mortgagor (Lyle and Maurice Tennant). Under South Dakota law, this clause is held to "supply the mortgagee with independent separate rights enforceable in his own name unaffected by

defenses predicated upon acts of the mortgagor. That the standard mortgage clause purposes to create comprehensive rights in the mortgagee is universally recognized." Union Central Life Ins. Co. of Cincinnati, Ohio v. Codington County Farmers Fire and Lightning Mut. Ins. Co., 66 S.D. 561, 566, 287 N.W. 46, 48 (1939).

In the *Union Central* case, the South Dakota court viewed the mortgagee as a third party beneficiary of the insurance contract between insurer and mortgagor and declined to follow what might be termed the majority rule which holds that the union or standard mortgage clause operates as an independent contract between the mortgagee and the insurer. In adopting the third party beneficiary concept the court indicates that its decision is prompted to some extent by the peculiar fact situation involved. The court expressly recognized the independent rights of the mortgagee, however, and appeared to equate the rights of the mortgagee as a third party beneficiary with those of the mortgagee whose rights flow from an independent contract. The court continued: "If the mortgagee performs the conditions contained in the mortgage clause, * * * a policy may only be rendered ineffective through a notice of cancellation as provided by the mortgage clause." 287 N.W. at 49.

When the truck was initially purchased, Maurice Tennant was not covered under the policy issued by Northland. Although Northland's agent Ingalls and the Tennants were aware that this situation existed, White Motor was not informed. The failure of Northland and the Tennants to give notice of this absence of protection lulled White Motor into believing that their interest in the truck was fully protected under the rights gained through the loss payable clause, and White understandably took no further steps to protect its interest.

The endorsement excluding Maurice Tennant from coverage during the policy year prior to the collision was executed by Lyle Tennant. The endorsement excluding Maurice Tennant and John Jager from coverage during the policy year in which the collision occurred was executed by Mrs. Lyle Tennant, who signed her husband's name to the endorsement. Mrs. Tennant acted as the bookkeeper in the Tennant trucking business and in that capacity was authorized to sign Tennant's name to checks, letters and other documents. On at least one occasion she had signed Lyle Tennant's name to a letter requesting that collision coverage as to one truck be terminated and that insurance coverage as to two other trucks be changed.

Mrs. Tennant testified that she did not tell her husband Lyle that she had executed the exclusion endorsement, but only told him of the execution of the installment payment agreement. Lyle Tennant was well aware that Maurice had been excluded under the prior policy, but testified that he did not read the renewal policy or the exclusion endorsement. He continued to allow Maurice to drive the truck not knowing whether coverage existed while he could have easily determined the coverage by reading the policy and exclusion or by calling Ingalls. The testimony of Lyle and Mrs. Tennant in regard to his ignorance of the exclusion endorsement hardly seems consistent with the importance which the Tennants now attach to insurance coverage on the trucks which they operate. It seems inconceivable that the subject of the insurance exclusion was never discussed by the Tennants during the nine months which followed between the execution of the exclusion and the collision. Tennant should not be allowed to profit from his self-induced ignorance of the exclusion in the renewal policy when a reasonably prudent person in Tennant's situation would have taken the action necessary to enlighten himself.

■ The Court concludes that in view of the fact that Mrs. Tennant had previously signed requests to change insurance coverage, which requests had been honored, and was admittedly authorized to sign checks for Lyle Tennant, and

that Lyle Tennant failed to inform himself as to the actions of his agent while accepting the benefits of her acts in regard to insurance coverage, the execution of the exclusion endorsement for the policy year of the collision is effective as against Lyle Tennant. *Cf.* Daum v. Urquhart, 61 S.D. 431, 249 N.W. 738 (1933); 2 C.J.S. Agency §§ 34–67.

Although no coverage existed as to Maurice Tennant, one of the mortgagors, Lyle Tennant was an insured mortgagor under the policy issued by Northland. During the policy year preceding the collision, Lyle Tennant allowed Maurice to operate the truck with full knowledge that no insurance coverage existed under those circumstances. When the policy was renewed, Lyle Tennant continued to allow Maurice to operate the truck without ascertaining whether Maurice was now an insured under the policy when the fact that Maurice was not insured could easily have been determined. That this act or neglect of Lyle Tennant invalidated the insurance coverage as to him is beyond question, and Tennant's counterclaim for damages against Northland under the insurance policy is therefore denied. However White Motor is insulated from acts of the mortgagor which invalidate coverage as to him by the protections afforded in the standard loss payable clause. White Motor has fulfilled its obligations as mortgagee so as to preserve its rights under the policy.

The Court concludes, therefore, that Northland Insurance Company is liable to the plaintiff White Motor for the damages sustained in the collision as the plaintiff's interests appear at the time of loss. As the coverage does not extend to the Tennants in this situation, Northland is by this decision required to pay a loss to the mortgagee where no liability exists as to the mortgagor. This situation falls clearly within the terms of the subrogation provision in the loss payable clause, and Northland is subrogated to the rights of White Motor against Lyle and Maurice Tennant.

## DAMAGES

As a result of the collision the White Freightliner was damaged extensively. Repair of the cab and frame was not recommended by White personnel because of the extensive labor necessitated. Replacement of the parts was determined to be most feasible and a new glider kit consisting of all truck components except the engine and transmission was used in the repair. The actual repair of the truck was accomplished at Omaha, Nebraska (because the Sioux Falls shop did not customarily undertake such extensive repairs). Although labor charges at Omaha were somewhat higher than in Sioux Falls, and resulted in a total increase of $180.00, the Court does not regard this as an attempt by White to "pad the bill" or increase the cost of repairs. White's decision to repair the truck in Omaha appears to have been reasonable under the circumstances.

The White Motor service manager who repaired the truck and the service manager from the Sioux Falls office testified that all repairs charged to Tennant and subsequently against Northland were necessary and were charged at fleet price; i. e., the discount price customarily given to insurance companies and dealers. The total cost of repair was alleged by White to be $14,537.94. A claims adjuster who testified for defendant Northland Insurance stated that the repairs could have been completed for approximately $11,750.00. The main reason for the difference of opinion as to the reasonable cost of repair was the price charged for the glider kit. The adjuster testified that he felt another glider kit could have been purchased for about $2,000.00 less than the price charged by White Motor. The service managers for White Motor testified that the price of the glider kit shown in the cost of repairs was a fleet price or discount price given to dealers and insurance companies. In repairing the White truck, it was reasonable for White Motor to use a White glider kit rather than to purchase a glider kit manufactured

by another company and sold at a lower price. The testimony indicated, however, that White had not allowed any credit for the salvage value of the wrecked glider kit. The salvage value, established at $400, should have been allowed as an offset on the repair costs. The Court concludes, therefore, that a reasonable cost of repair of the damaged White Freightliner truck was $14,137.94. Inasmuch as Northland's collision coverage was $250.00 deductible, the amount owed by Northland to White Motor is $13,887.94.

Prior to the collision Tennant had made prepayments through May, 1969, on the security agreement with White Motor. On June 1, 1969, when White Motor repossessed the truck, the pay-off figure on the contract was $15,861. Thereafter, White repaired the vehicle and on October 29, 1969, sold it for $18,500. Additional interest earned between the pay-off date of June 1st and the sale date of October 29, 1969, was established at $700.

■ The security agreement provided that the rights of White Motor with respect to repossession and resale of the truck and disposition of the proceeds were to include those afforded by the South Dakota Uniform Commercial Code. The pertinent section of the Commercial Code, SDCL 57–8–23 (1967) provides that, "the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Chapter (§ 57–8–27), due allowance for costs, reasonably incurred, and due credit for payments or proceeds of resale." Under these provisions, the amount which White Motor would be entitled to recover against the Tennants upon default, repossession and resale by White Motor would be the pay-off price, $15,861, plus the interest charges of $700 for the five months until resale was accomplished, or a total of $16,561. Under the terms of the security agreement, and the provision of the SDCL previously cited, White Motor became obligated to Tennants for the amount by which the proceeds of resale exceeded the amount due White Motor. Since the truck sold for $18,500 and White Motor's interest was $16,561, White Motor became obligated to Tennants for $1939.

■ Since the Court has determined that Northland is liable to White Motor for the amount of repairs and the Tennants are liable to Northland under the subrogation agreement, the $1939 which White Motor owed to the Tennants will be applied to reduce the amount owed by Northland to White Motor. The net result is to reduce the amount owed for cost of repairs by $1939, leaving the amount due White Motor from Northland at $11,946.94.

■ South Dakota law provides that prejudgment interest may be awarded a successful plaintiff where the damages are certain or may be made certain by calculation. SDCL 21–1–11 (1967). Peter Kiewit Sons' Co. v. Summit Construction Co., 422 F.2d 242 (8th Cir. 1969). In the present case, the damages were reduced to a sum certain upon completion of the repair of the truck on July 25, 1969, and interest is awarded from that date at the rate of six per cent per annum.

The foregoing memorandum decision shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.